These four cases were instituted against the Louisiana Highway Commission by virtue of Act No. 366 for the year 1940. They were consolidated in the lower court for the purpose of trial and submission, a separate judgment to be rendered in each case. They were again consolidated in this court for argument and submission with the understanding that a separate decree will be made in each case.
These suits arise out of an automobile-truck accident which occurred on the Franklinton-Bogalusa Highway in Washington Parish, on Sunday night of February 12, 1939, at about the hour of 10:15 P.M., at a point one and one-half mile from the business center of the City of Bogalusa. While the accident occurred within the corporate limits of the said city, it did not occur on a city street, but on a standard highway leading from the City of Bogalusa to the town of Franklinton. The automobile involved in the accident belonged to Fergust C. Ledet, Sr., but was being driven by his son Fergust C. Ledet, Jr. Riding in the automobile, prior to and at the time of the accident, with young Ledet were Jack Warnick, Robbie Emma Jeannette Bateman and Lou Ethel Bateman. The said Jack Warnick, Robbie Emma Jeannette Bateman and Lou Ethel Bateman were instantly killed, and Fergust C. Ledet, Jr., received injuries, and the automobile belonging to Fergust C. Ledet, Sr., was demolished. The truck involved in the accident belonged to the Louisiana Highway Commission, and was in charge of and being driven by one Leo Carpenter, its employee.
The plaintiffs are: (1) Charles M. Warnick, Maurice Warnick, and Mrs. Ray *West Page 609 
Warnick Berk, brothers and sister of Jack Warnick, who sue for damages in the amount of $15,600 as his sole and only heirs, the said Jack Warnick having died unmarried and without issue or living ascendants. (2) Mr. and Mrs. Murphy Bateman, who claim damages totaling $40,060, as the father and mother of Robbie Emma Jeannette and Lou Ethel Bateman, who died unmarried and without issue. (3) Mr. and Mrs. Fergust C. Ledet, Sr., who claim damages for the loss of the support of their son, and for their expense in his hospitalization, nursing and care, and for the damage to the automobile, totalling the sum of $6,750. (4) Fergust Ledet, Jr., who sues for personal injuries sustained, to the amount of $10,000.
On the night of this tragic accident, Fergust C. Ledet, Jr., had the use of his father's Chevrolet automobile and invited Jack Warnick to take an automobile ride with him. They were subsequently joined by the two Bateman girls, who lived in Franklinton. Lou Ethel Bateman was sitting on the front seat next to young Ledet, the driver; Warnick and Robbie Emma Bateman occupied the rear seat. All of the petitions are of like tenor and version with regard to the cause of the accident, and charge of negligence on the part of defendant, the only variation being the amount of damages claimed and the reasons therefor.
The petitions aver that after young Ledet and his guests had visited the City of Bogalusa, while on their return to Franklinton, evidently to return the Bateman girls to their home, and while proceeding along the Bogalusa-Franklinton Highway, and on reaching a point some mile and a half from the business district of the City of Bogalusa, but still within the city limits, a truck suddenly, without warning, loomed up in front of them out of the dark; that this truck was either stopped in the highway or was very slowly moving along the highway in the same direction in which they were going, without any lights burning, lamps visible or flares or flags to indicate its presence on the highway; that, at that point, the paved slab on the highway is the standard 18-foot slab, and that the truck was occupying a portion entirely on the right-hand side of the slab in the direction toward Franklinton.
It is alleged that young Ledet was operating the automobile on his right-hand side of the road, in a careful and prudent manner and that as the truck loomed up before him, he sharply cut the automobile to the left, in order to avoid running into it, but notwithstanding all his efforts, the post on the right side of the automobile with which the top of the automobile and windshield were connected, struck the left rear corner of the steel body of the truck, smashing into the right side and top of the automobile, thereby causing the death of the three persons, and seriously injuring Ledet. It is further alleged that the occupants of the truck drove off immediately after the crash, without attempting to ascertain the condition of the occupants of the automobile or rendering them aid or assistance, in violation of Rule 18 of Section 3 of Act 286 of 1938; that it was not until the second day following the accident that the identity of the truck and its occupants was ascertained.
They averred that at the time of the accident the truck was being operated by one Leo Carpenter, an employee of the Louisiana Highway Commission, to which the said truck belonged, and which said truck was at all times in his custody and under his control. They also allege that the said Leo Carpenter had been so employed for ten years and that at the time of the accident he was a Unit Leader, carrying a responsible position requiring discretionary powers and duties, having had at all times from two to eight employees, and from one to eight trucks under his supervision and control. It is also alleged, in regard to the truck involved in the accident, that it was in his sole charge and custody, and that it was his duty to keep it at his home, near the town of Franklinton in order to answer night calls. They further allege that, at the time of the accident, the said Leo Carpenter was acting within the course and scope of his employment. The specific charges of negligence against the defendant's truck driver are: (1) Parking or very slowly driving the truck, which was a dangerous and defective instrumentality, along a paved highway at night, without lights, flares or otherwise signaling or indicating his presence on the highway, and (2) operating the truck on the highway without even being equipped with rear lamps, clearance lamps, parking lights, a muffler, rear view mirror, flares or flags.
The defenses to this suit are as follows: (1) That the driver of the truck belonging to the Louisiana Highway Commission was not, at the time of the accident, in the *West Page 610 
course and scope of his employment. (2) In the alternative, if the court should find that the said Carpenter was within the course and scope of his employment at the time of the accident, then and in that event he was not negligent in the operation of the said truck. (3) Even if the court should find that the said Carpenter was negligent in the operation of the truck, then and in that event it is contended that young Ledet was negligent and that his negligence was the sole proximate cause of the accident. In a supplemental answer, the defendant further sets forth, as against Fergust C. Ledet, Jr., that he was guilty of contributory negligence in driving at an excessive and illegal speed, driving at night in a thickly populated section in a reckless and careless manner, not having his automobile under proper control, and therefore is in bar of his recovery.
In the case of Mr. and Mrs. Fergust C. Ledet, Sr., an exception of no cause of action was filed with reference to all demands, save and except the demand for damages to the automobile which exception was sustained, and the damages awarded Mr. Ledet, Sr., for the automobile is the only matter in contest in that suit.
On the issues presented, the lower court, in a lengthy written opinion in which he discussed fully the facts and the law and the quantum of damages to be awarded in each case, rendered judgments in favor of: (1) In the Warnick case, the sum of $1,000 to each of the plaintiffs, and the additional sum of $583 to the plaintiff Charles M. Warnick for the funeral and other incidental expenses incurred by him. (2) In the Bateman case, the sum of $8,000 to each of the plaintiffs for the death of their two daughters, plus $60 incurred by plaintiff Murphy Bateman for the funerals. (3) In the Ledet, Sr., case, he awarded the sum of $410 to Mr. Lebet, Sr., for the damage to the automobile. (4) And in the case of Fergust C. Ledet, Jr., he awarded the sum of $750 as personal damages suffered by him.
Defendant has appealed in all four cases. Answers to the appeals were filed in each case. In the Warnick, Bateman and Ledet, Jr., cases an increase in the amounts awarded is prayed for; and in the case of Ledet, Sr., an affirmance of the judgment is prayed for.
There are three principal issues to be considered in these cases. (1) What was the nature of Leo Carpenter's employment and was he acting within the course and scope of his employment at the time of the accident? (2) Assuming that he was employed by the Louisiana Highway Commission and that he was acting within the course and scope of his employment, was he and his employer guilty of negligence in any way, and, if so, was such negligence the proximate cause of the accident and the damage resulting therefrom? (3) If there was no such negligence, did the manner of driving the automobile by Ledet, Jr., constitute such negligence as to be the proximate cause of the accident, thus preventing recovery on the part of the plaintiffs? The fourth issue in the case only involves the case of Fergust C. Ledet, Jr., that is, the plea of contributory negligence made against him.
Carpenter had a rather responsible position as a Unit Leader of the Highway Commission in Washington and surrounding parishes. His main position was that of a dragline operator and he had several men working under him. He was in complete charge of one or more trucks engaged on any job, and it is definitely shown that on the night of the accident the truck involved therein was in his complete care, custody and control. It was his duty to keep this truck at his father's home near Franklinton at night in the event of any emergency which might arise requiring his presence in attending to the trouble. In the event that his work required him to be far away from home, he was authorized to keep the truck with him wherever and whenever he stopped.
At the time of this accident he was engaged in dragline operations in the town of Bogalusa and had just completed a job on the Saturday morning before. He was notified that the dragline was to be moved from the place of operation to another. In order to do so, he notified his superior officers, who, in turn, notified the main office at Baton Rouge. He was so instructed that he was to have help in the removal of the dragline from the place of operation and that a truck and some help would be given him on Saturday or Sunday and that he was to be on the lookout for the same. This help failed to appear on the Saturday evening, causing Carpenter to remain in Bogalusa the Saturday night and on Sunday Carpenter made several trips to the place of operations to see if the help had arrived. As this help did not show up as late as 2 o'clock on Sunday afternoon, Carpenter became convinced that it was no *West Page 611 
longer necessary to await it. In the meantime, Carpenter had hidden such tools as he may have had on the job in the grass and weeds. At about 3 o'clock in the afternoon he re-visited the scene of operations and picked up such tools which were used by him and had been hidden in the grass and put them in the truck. He returned to Bogalusa, parked the truck, and went on a ride with some of his friends. Some time later, after his ride with his friends, he returned to his truck and drove in the truck around Bogalusa and picked up two girl friends who went with him to his father's home near the town of Franklinton. He states that he went there for the purpose of obtaining some money. But the facts show that when he got to the yard of his father's home, he was met by his brother, Dallas Carpenter, who got in the truck with him and the two girls, and accompanied by these three guests Leo Carpenter then drove the truck back to Bogalusa. It is not shown whether or not he obtained any money which he thought might be needed. However, the evidence shows that the motor of the truck never stopped running while at his father's home. He and his brother and the two girl friends on arriving in Bogalusa drove around the city, and Carpenter finally took the young ladies to their respective homes. From there, he and his brother started on their way back to Franklinton, for the purpose, as he admits, of going back to the place where he stayed, to take back the truck to where it was his duty to keep it.
It was when leaving the town of Bogalusa, and while on his way back to Franklinton, that this unfortunate accident happened. The trial judge came to the conclusion, under these facts, that Carpenter was acting in the course and scope of his employment at the time of the accident. He states, after discussing the actions of Carpenter on that Sunday afternoon, together with his intention to return the truck and tools to the place where the truck and tools were kept: "I am of the opinion that in so doing he was acting in the furtherance of his master's business or in the scope of his employment. Particularly is this true when it is shown that Carpenter was responsible for the truck and the tools and was subject to emergency calls at night from his superiors in connection with his work on the highways". The trial judge, basing his opinion principally on the case of Cusimano v. A.S. Spiess Sales Company, 153 La. 551, 552, 96 So. 118, cites with approval the well written article of Honorable Hollingsworth B. Barrett of the Shreveport Bar reported in 14 Tulane Law Review, pages 72 to 81, wherein the question of the course and scope of employment in a case of this character is ably discussed, and, in our opinion, correctly set forth. In that article, the writer concludes: "That in order to show the re-entry of the employment by the driver at the commencement of the journey that the following three elements must be present: The trip must have had its origin in the employer's business; the mental purpose of the employee following his departure from employment must be to return to his next duty, whether that be further work or the return of the vehicle to the place where it belongs; third, the purpose to return must have been put into effect by starting the return journey."
Applying these three elements, as set forth by Mr. Barrett, to the case at bar, we find that Mr. Carpenter was employed by the defendant as dragline operator and had had the truck in question under his absolute supervision and care. His staying over in Bogalusa on the Saturday was within the course and scope of his employment. His using the truck on the Sunday, at 2 or 3 o'clock in the afternoon, was also in the course and scope of his employment. When he returned to the field of operation to obtain the tools and return the truck to his boarding place he was likewise within the course and scope of his employment. We admit that when he went on a joy ride with some of his friends in another vehicle was not in the course and scope of his employment. Also, we admit that when he picked up his two girl friends in the truck for the purpose of joy riding, he was not then in the course and scope of his employment. But we are of the opinion that when he returned these two girls to their homes, after the ride had terminated and from the moment that he left them on his journey to deliver the truck where it belonged, he was then within the course and scope of his employment. The three conditions as set out by Mr. Barrett are fully met in this case.
Besides the case of Cusimano v. Spiess Sales Company,153 La. 551, 552, 96 So. 118, we find a more recent case bearing on the point and one which perhaps goes even further than the others in holding that the servant has re-entered his employer's *West Page 612 
business after having deviated from it during the whole afternoon. This is the case of Matheny v. United States F. G. Co., 181 So. 647, decided by the Court of Appeal for the Second Circuit. In that case the servant, who was an automobile salesman and who, like Carpenter in the instant case, had his employer's car in his custody and control for the purpose of his employer's business, deviated from his employer's business and took a pleasure trip with some friends. On his return trip he was involved in a collision and the court held that he was then in the course and scope of his employment.
No hard and fast rule can be laid down in such cases, and every case must rest on its particular facts. In the instant case, we find that the three elements which should be present to sustain the conclusion that the driver was within the scope and course of his employment at the time of the accident are shown by the evidence to exist.
The next question to be decided is whether or not Carpenter was negligent in the operation of his truck, and if so, was such negligence the proximate cause of the accident.
It is admitted that this truck had no taillights, no clearance lights or rear vision mirror, and the testimony leaves us in grave doubt whether it had any headlights burning at the time of the accident. However, this is not so important in that the accident was a rear-end collision. The excuse for the lack of taillights and clearance lights is the fact that this truck was used for the purpose of hauling gravel and that taillights cannot be kept for such purposes. No excuse is given for the lack of clearance lights, however. In view of the evidence in the record, this truck was intrusted unto Leo Carpenter for his use, not only during the day time, but also at night. It comes with bad grace from the defendant to say that this truck was not fully equipped with such lights as are required by the Statute, Act 286 of 1938. A greater duty devolved on it, a public body, to see that the rules and regulations prescribed by the Act were properly observed.
It is urged by the defendant that the truck had not come to a complete stop at the time of the collision. This probably could be offered as a defense for not having displayed any flares on the highway, but it must be remembered that the truck had no such flares to display. Yet, the trial judge, under the evidence, came to the conclusion that the truck had come to a complete stop. Nevertheless, even though the truck was in motion, Leo Carpenter, the truck driver, well knowing that this truck did not have any clearance lights, taillights, rear view mirror, and flares, should have pulled it entirely off of the paved portion of the highway onto the shoulder, and not leave it, as he himself admits, occupying the greater portion of the right lane of travel of the paved portion. We are therefore of the opinion that Leo Carpenter, the driver of the defendant's truck, was negligent and that his negligence was at least a proximate, if not the sole, cause of the accident. As to the plaintiffs seeking to recover damages for the death of the three occupants and the damage to the automobile, there cannot be any negligence imputed to the decedents or the owner of the automobile, and none was pleaded. If Ledet, Jr., the driver of the automobile, was guilty of any negligence at all, it certainly was not the sole and proximate cause of the accident, and can only operate as a bar to his recovery, which is next to be considered.
We are once more faced with the ever-recurring proposition of negligence, vel non, of a driver driving an automobile on the highway at night and running into the rear end of a parked or stopped vehicle that has no signal lights or any other warning device to indicate its presence on the highway.
The highway, at the point of the accident, consisted of a concrete slab 18 feet in width, with shoulders on both sides of 6 feet or more, and it is practically level. The truck was stopped on the paved portion of the highway, with the left wheels near the center line, facing west, being in the same direction Ledet, Jr., was travelling. Ledet admits that he was travelling at a speed of about 40 miles per hour just prior to the accident. Counsel for defendant contends that this was in violation of an ordinance of the City of Bogalusa, and sought to prove the existence of such ordinance by the Chief of Police of said city. The evidence was objected to and the objection was properly sustained, as the best proof of such regulation is a certified copy of said ordinance. However, he further contends that it was excessive in that the accident occurred in a rather populous section. The oral evidence and the photographs introduced do not substantiate such *West Page 613 
conclusion. Furthermore, the proof shows that at the time there wasn't much traffic on the road at that point. We are therefore of the opinion that Ledet's speed was not excessive.
The evidence shows that this truck had been used just prior to the day of the accident in the hauling of clay, dirt and gravel; though its original color was orange, on the night of the accident, due to its usage, it was a dull color and difficult to see at night. The back wheels of the truck recessed in from the body about 18 inches and the floor of the body was 4 feet from the ground, thus making it difficult for the lights of an automobile to disclose it before it was right on it, especially where the lights were dimmed in order to pass an on-coming car, as Ledet says was done in this case, which dimming had the effect of projecting the beam of the lights under the body of the truck. The color of the truck, according to the testimony vaguely blended with the pavement, and made it even more difficult for Ledet, in his approach, to discern it. The on-coming car also had some effect on Ledet's driving, impairing his vision momentarily. To take care of this impairment, Ledet says that he released his foot free from the accelerator, which no doubt had the effect of slowing down his speed.
Defendant contends that as Ledet was coming up the hill, that necessarily his lights were thrown up in such position that he was bound to see the truck. The hill, which is made so much about by the defendant, is only an incline of some 2% grade and is hardly perceptible in the photographs which were offered in evidence. The truck had reached the top of this incline, and the evidence preponderates to the effect that the road was level at that point. Ledet also testified that he had just rounded two curves, which he says also caused him to reduce the speed of his car. The fact remains, after considering all of the proof, that his testimony stands uncontradicted to the effect that he was practically on the truck and just saw the tires on it in time to swiftly veer his car to the left and succeeded in pulling only the front portion of it beyond the truck, but unfortunately striking the left rear end of the truck with the right front of his car at the post or support of the windshield in front of the seat occupied by the young lady seated next to him, with above-recited fatal results. We do not find much distinction between this case and the case of Gaiennie v. Co-operative Produce Company, Inc., et al., 196 La. 417, 199 So. 377, wherein the Supreme Court held that the driver of an automobile that strikes the rear end of a parked vehicle in cases of this kind is not guilty of such negligence as to bar his recovery. Applying the principles as announced in that case to the case at bar, we are of the opinion, as found by the trial judge, that Ledet was not guilty of any contributory negligence barring his recovery.
Having settled the question concerning the liability of the defendant toward the plaintiffs, it remains for us to consider the quantum of damages.
In the case of Warnick et al., the Judge allowed to each plaintiff the sum of $1,000. We find no reason to disturb that award in any way. The young man who was killed no doubt was held in great esteem and affection by his brothers and sister. The award made to Charles M. Warnick for the expenses claimed in connection with his brother's death seem to have been proven and we are not disposed to say that the trial judge erred with reference thereto. The awards of the lower court will therefore be affirmed.
In the Bateman case, the district judge seems to have been guided by the awards made by us in the case of Boykin v. Plauche and others, La.App., 168 So. 741, in which we had allowed $9,000 to the mother alone for the death of her son, about 23 years of age. On rehearing we reduced the amount to the sum of $8,000. 169 So. 131. It is urged by counsel for the plaintiffs who are asking for an increase in the amount of the award that here the demand is made by both the father and mother and that each should be entitled to recover on the same basis of the one parent in the Boykin case. If the award were to be made on that basis, it would mean that each parent would be entitled to receive $8,000 for the death of the two girls, which would make a total award of $32,000. In the Boykin case, the mother, who was the plaintiff in the suit, was legally separated from her husband, and the latter seems to have severed practically all of his relations growing out of that marriage and had very little interest left in his son who had been killed. In other words, under the situation which there existed the mother had practically taken all of the love, affection and companionship *West Page 614 
which was left in the son, and besides, she looked to him for her future support.
These two young ladies who were killed in this accident certainly seem to have been of very fine character and disposition and occupied a very close place in the hearts and affection of their parents. Not only that, but both of them seemed to have been of considerable help to the family in assisting their father in his hardware business. In Keowen v. Amite Sand Gravel Co., 4 So.2d 79, we affirmed an award of $10,000 for both parents for the death of their son. That award was on the basis of $5,000 for each of the parents, and we feel that this case merits a like award, making a total award to both parents, in the case at bar, of $20,000, an increase of $4,000 in the amount of the judgment appealed from.
In the case of Fergust C. Ledet Sr. for the loss of his automobile, the trial court, in writing his judgment, went into minute details as to what had been proven and not proven, and came to the conclusion that the net value of the damage to the automobile was the sum of $410. Counsel for defendant complains that Mr. Ledet failed to prove what he originally paid for the automobile. The lower court in his judgment came to the conclusion that since the proof was sufficient to establish that the automobile was a demonstration automobile, not showing much mileage when Mr. Ledet bought it and that the value at which Mr. Ledet estimated it was reasonable, he so fixed its value. We are not in a position to disturb such value. Based on that value, and allowing the amount of depreciation, which the trial judge took into consideration, it is our opinion that he struck a very reasonable balance when he made the allowance of $410 net for the loss which this plaintiff sustained, and finding no reversible error, the award will be affirmed.
In the case of Fergust C. Ledet, Jr., the trial judge allowed $750. This young man suffered a very serious injury to his mouth, including his lip, teeth and gums. He sustained a fracture of the nose, a broken arm, a bruised shoulder and a strained back. The scar which is left on his upper lip must be a very annoying one, as from the evidence, it extends for more than one inch. True, it is covered by the mustache which he wears, and which it is shown he used to wear even before the accident. This, however, does not detract from the fact that he has a scar and that it will remain permanently. It is our opinion that this young man is entitled to the sum of $1,250 for the damages set forth above, making an increase of $500. Judgment will be rendered accordingly.